THOMAS TREMLETT, PLAINTIFF IN ERROR, *v.* JOSEPH T. ADAMS.

The tariff law of July 30, 1846 (9 Stat. at Large, 42,) reduced the duties on imported coal, and was to take effect on the 2d of December, 1846.  The sixth section provided that all goods, which might be in the public-stores on that day, should pay only the reduced duty.

On the 6th of August, 1846, (9 Stat. at Large, 53,) Congress passed the Warehousing Act, authorizing importers, under certain circumstances, to deposit their goods in the public stores, and to draw them out and pay the duties at any time within one year.

But this right was confined to a port of entry, unless extended, by regulation of the Secretary of the Treasury, to a port of delivery.

Therefore, where New Bedford was the port of entry, and Wareham a port of delivery, the collector of New Bedford (acting under the directions of the Secretary of the Treasury) was right in refusing coal to be entered for warehousing at Wareham.

Where an importer deposited a sum of money, as estimated duties, with the collector, which, upon adjustment, was found to exceed the true duty by a small amount, and the collector offered to pay it back, but the importer refused to receive it, the existence of this small balance is not sufficient reason for reversing the judgment of the Circuit Court, which was in favor of the collector.

THIS case was brought up, by writ of error, from the Circuit Court for the District of Massachusetts.

It was a suit brought in the Circuit Court, by Thomas Tremlett, a merchant of Boston, against Adams, the collector of the port of New Bedford, for return of duties.

The case is stated in the bill of exceptions, which was as follows:

This was an action of assumpsit, brought against the defendant, collector for the port of New Bedford, to recover the sum of twenty-two hundred and sixty-seven dollars, seventy-seven cents, and interest, excess of duties upon sundry cargoes of coal, imported into the port of Wareham, in the collection district of New Bedford, by the plaintiff, and claimed to be illegally exacted by said defendant, and paid by said plaintiff under protest.

At the trial of the case before his honor, Judge Sprague, the following facts were admitted by the defendant, namely:

1st. That, in the months of September and October, 1846,

Tremlett *v.* Adams.

the plaintiff, Thomas Tremlett, a merchant of Boston, imported from Pictou, in Nova Scotia, into the port of Wareham, in the collection district of New Bedford, nine cargoes of coal, as follows, namely:

| | Chaldrons. | T. | Cwt. | Qrs. | Lbs. | Duty charged. | Money deposited. |
|---|---|---|---|---|---|---|---|
| Brig Indus . . . | 121 1-6 | 157 | 13 | 2 | 12 | $279 44 | $285 00 |
| Schooner Congress . . | 132 | 173 | 19 | 0 | 16 | 304 42 | 315 00 |
| Brig Mary Sophia . . | 116 1-6 | 153 | 10 | 2 | 12 | 268 68 | 280 00 |
| Barque Acadia . . . | 249 11-12 | 329 | 7 | 0 | 10 | 576 37 | 575 00 |
| Brig Charles Edward . | 153 3-12 | 210 | 19 | 0 | 26 | 353 43 | 360 00 |
| Schooner Armida . . | 161 5-12 | 212 | 14 | 1 | 26 | 372 27 | 375 00 |
| Brig Hudson . . . | 161 2-12 | 212 | 7 | 3 | 16 | 371 69 | 375 00 |
| Brig China . . . | 173 8-12 | 228 | 17 | 1 | 12 | 400 52 | 400 00 |
| Brig Moselle . . . | 289 8-12 | 249 | 19 | 0 | 8 | 457 32 | 438 00 |
| | 1458 9-12 | 1922 | 8 | 1 | 26 | $3364 14 | $3403 00 |

Amounting, in the aggregate, to $1,458\frac{9}{12}$ chaldrons, or 1,922 tons, 8 cwt. 1 qr. 26 lbs., as appears by the custom-house records.

These several cargoes of coal were shipped at Pictou, for the port of Wareham, a port of delivery only; and, upon the arrival at that port of the first-mentioned vessel, the brig Indus, on or about the 3d of September, 1846, the plaintiff made application at the custom-house in New Bedford, to the defendant, Joseph T. Adams, then collector at said port, to enter said coal, for warehousing, at Wareham, aforesaid, under the provisions of the act of Congress, entitled, "An act to establish a warehousing system," &c., passed August 6th, 1846. But the defendant refused to allow the plaintiff to enter said coal for warehousing, as aforesaid, under the act aforesaid, because said Wareham was not a port of entry, but a port of delivery; and required him, if he would land said coal at said Wareham, to enter the same under the act for the collection of duties, passed August 30th, 1842, and to deposit $285 to cover the duties which might be found to be legally due and payable thereon. The plaintiff, in order that said vessel might be permitted to discharge her cargo, complied with this requisition, first entering the following protest in writing:

" I protest against paying duties, wishing to warehouse the coal per brig Indus, from Pictou;" and signed " Thomas Tremlett, by his attorney, Jacob Parker."

The usual permit was then granted by the collector, to land the coal from said vessel at said Wareham, and the coal was accordingly landed; and, upon the arrival at said Wareham of the other cargoes of coal, by the several vessels above named,

said plaintiff made like applications to the defendant, at the collector's office at New Bedford, to enter each cargo for warehousing under said act of August 6th, 1846, at Wareham, aforesaid.

But the defendant, in like manner, as in the case of the brig Indus, refused permission to warehouse, as aforesaid, and required the plaintiff to make the same entry as in that case, and deposit a sum of money upon the entry of each cargo, sufficient to cover the duties which might be found to be legally due and payable thereon, under the provisions of the act of August 30th, 1842, the plaintiff first entering a protest in writing, in each case, and upon the entry of each cargo, in manner and form as in the case of the brig Indus, above mentioned; and said coal was thereupon landed, and deposited in the same manner as that per brig Indus.

2d. That all of said coal, landed at said Wareham from the above-named vessels, was deposited in one pile, and remained in the place where it was originally deposited until after December 19th, 1846.

3d. That the aggregate sum deposited with the defendant by the plaintiff, to cover the amount of duties on the several cargoes of coal above mentioned, was $3,403, and the duties on said coal, computed under the Tariff Act of August 30, 1842, would amount to $3,364.14; that by the act of July 30, 1846, the duties on the coal in question would amount to $1,135.23.

4th. That the brigs Indus and Mary Sophia were British vessels; that it has been the invariable practice of the collectors at New Bedford, for more than twenty years, to allow foreign vessels the same rights and privileges, as to unlading and discharging their cargoes at the port of Wareham, that are granted to American vessels, and that no objection was made or intimated by the defendant to the plaintiff to his landing the cargoes of said " Indus" and " Mary Sophia" at said Wareham.

5th. That said Wareham is the principal port, in the collection district of New Bedford, where coal is imported for consumption.

6th. That the defendant, on or before the 19th of December, 1846, delivered to the plaintiff's attorney a statement of the balance due to the plaintiff for money deposited, over and above the amount of duties claimed on the nine cargoes of coal aforesaid, amounting to $38.86, and offered then to pay the same to M. Parker, the plaintiff's attorney, which he declined to receive; and that on the 13th of November, 1849, Mr. Adams, the defendant, tendered the same amount in specie to Thomas Tremlett, the plaintiff, at his office in Boston, which he refused to receive, and informed the defendant that in 1846 he instructed Mr. Parker, his attorney, not to receive it.

7th. That the paper hereto annexed marked A, is a true copy of the commission under which D. Nye acted as an officer of the revenue, from the date of the commission till after January, 1849; and that the paper marked B, annexed hereto, is a true copy of an official letter, received by D. Nye from said defendant, at or about the time it bears date, and that the papers annexed, marked C and D, are true copies of official letters received by the defendant from the Secretary of the Treasury of the United States.

Boston, December 13th, 1849.

(The paper marked A was merely an authority to David Nye to act as deputy-collector, inspector, gauger, weigher, and measurer, for the port of Wareham, dated October 3, 1843.

The paper marked B was an authority to Nye, from Adams, under the authority of the Secretary of the Treasury, to warehouse coal, &c., at Wareham, under the Warehousing Act of 1846. But this authority was dated August 22, 1848.

The paper marked C was dated August 27th, 1846, and was a letter from the Secretary of the Treasury to Adams, refusing to allow any article to be warehoused without the limits of a port of entry.

The paper marked D was from the same to same, dated July 5th, 1849, merely saying that the District Attorney had been instructed to defend Adams in the suit brought by Tremlett.)

Upon those facts the plaintiff, by his counsel, requested the court to rule and instruct the jury, —

1st. That the right or privilege of warehousing goods at any ports or places within the United States is regulated by the laws of Congress, which specify the ports and places at which, and the manner in which, such warehousing shall be permitted, and that no discretion as to the selection of such ports or places, or as to the manner in which such warehousing shall be allowed, is reposed in the collector, or any other executive officer.

The plaintiff further requested the court to rule and instruct the jury, —

2d. That by law there is no distinction as to the exercise of such right of warehousing between ports of entry and ports of delivery, and that if the plaintiff at the time had a right, under the existing laws, to warehouse his goods in a port of entry in any district in the United States, he had equally a right to warehouse them at any port of delivery in such district, upon complying with the requirements of the laws regulating the warehousing of goods.

The plaintiff further requested the court to rule and instruct the jury, —

3d. That the plaintiff, being unlawfully prevented from ware-

housing his goods as aforesaid, and required to pay duties upon them according to the rates established by the Tariff Law of 1842, ought to recover of the defendant the difference between the amount of duties chargeable under the Tariff Act of 1842 and that under the Tariff Act of 1846, and interest thereon from the time of payment of the several sums.

The plaintiff further requested the court to rule and instruct the jury, —

4th. That if, upon the facts, the plaintiff could not recover the whole of the difference between the amount of duties properly chargeable under the act of 1842, and the amount properly chargeable under the act of 1846, he was entitled to recover the sum of $38.86, being the surplus in the defendant's hands over and above the amount of the duty properly chargeable according to the act of 1842. But the court refused to give the instructions so prayed for; but, on the contrary thereof, did rule and instruct the jury that the plaintiff could not maintain his action, nor recover either of said sums of money, or any part thereof; to all which rulings and instructions the plaintiff excepts, and prays that his exceptions may be allowed.

PELEG SPRAGUE, [SEAL.]
Judge, &c.

The jury accordingly found for the defendant, and upon these exceptions, the case came up to this court.

It was argued by *Mr. Sherman*, for the plaintiff in error, and by *Mr. Bibb*, for the defendant in error. There was also an elaborate brief on the same side, filed by *Mr. Crittenden*, (Attorney-General.)

*Mr. Sherman*, for the plaintiff in error, contended that the court below erred, —

1st. In refusing the instructions prayed for in behalf of the plaintiff below.

2d. In the instructions which it gave to the jury.

(The arguments of the counsel upon both sides were founded upon a minute examination of preceding laws, which it would be difficult to compress within reasonable limits, and at the same time do justice to the arguments. The reporter, therefore, confines himself to a mere statement of the points.)

Mr. Sherman united both the above points in his arguments.

1st. That, under the Constitution and laws of the United States, a right existed to warehouse the coal at a port of delivery.

2d. The right to warehouse at the port in question being given by law, the plaintiff could not be deprived of that right by any instructions issued by the Secretary of the Treasury to carry the

act into effect. : Sect. 5 of Warehousing Act, 9 Stat. at Large, 53; Tracy & Balister v. Swartwout, 10 Pet. 95; Elliot v. Swartwout, 10 Pet. 153; and Greely v. Thompson, 10 How. 234, decided at the last term of the Supreme Court.

3d. The defendant, as collector of the customs, having deprived the plaintiff of the right to warehouse his said nine cargoes of coal at Wareham, and to enter the same, under the Tariff Act of July, 1846, upon the payment of $1,135.13, the duty imposed on the same by that act, and exacted of the plaintiff a deposit of money, as for duties, amounting to $3,403, the plaintiff has a right to recover the difference, with interest.

4th. Or, otherwise, if it be decided that the duties were legally due under the Tariff Act of 1842, amounting to $3,364.11, the plaintiff having deposited with the defendant the sum of $3,403, is entitled to recover the difference, viz., $38.89, with interest. Boyden v. Moore, 5 Mass. R. 365, 369; Breed v. Hurd, 6 Pick. 356; Whipple v. Newton, 17 Pick. 168.

On the other hand, the counsel for the defendant in error contended that the first, second, and third instructions, as moved, were not according to the law of the case upon the facts established by the evidence, and facts pertinent to the issue, which no evidence conduced to prove, (and are therefore to be considered as not having existed.) They would, if given, have misled the jury.

The first and second instructions moved, misconstrue the revenue laws. Important distinctions between ports of entry and delivery, and ports of delivery only, are made by the laws. The Secretary of the Treasury had a discretion to refuse to suffer coal to be warehoused at ports of delivery only, where no collector, naval officer, or surveyor resided; where the collector of the port of entry had to discharge, at one, two, or three ports of delivery only, annexed to his collection district, all the duties of collector, naval officer, and surveyor; and where, in the opinion of the Secretary, the additional charge of a permanent officer to reside at the port of delivery only, with the rent to be paid for warehouses, would overgo the receipts from storage, and diminish the revenue at such port of delivery only.

The third instruction moved by the plaintiff, when applied to the facts of the case, assumes, in the first place, that the Secretary of the Treasury "unlawfully" prevented the warehousing of the coal at Wareham; and in the next place assumes that, because the collector obeyed the instructions of the Secretary, the defendant became a wrongdoer; and in the third place assumes that the defendant is liable, and, in the language of the count, became indebted to the plaintiff, and promised him to

Tremlett *v.* Adams.

pay the difference of duty on the coal between the Tariff of 1842, and that of December, 1846.

If the Secretary of the Treasury had been sued as the wrong-doer instead of the collector, the Secretary could have defended and maintained his instructions against warehousing coal at Wareham, a port of delivery only, as being a lawful exercise of a discretionary power confided by the revenue laws existing before the act to establish a system of warehousing, not impaired by that act, but confirmed by its fifth section; which discretionary power so given by the laws, was necessary and proper to the uniformity and efficiency of the system of revenue from the customs, over which the judicial department has no control.

The second proposition assumed by the plaintiff, that the defendant, in obeying the instructions to him as collector, by the Secretary of the Treasury, against warehousing the coal at the port of Wareham, became thereby a wrongdoer, and liable to the plaintiff for damages, would not follow, if it were conceded, that the Secretary of the Treasury, in the exercise of his functions, erred in the construction of the revenue laws, and thereupon issued wrong instructions to the collector against warehousing at Wareham.

The third assumption, as to the amount of the remote consequential damages, would not follow from the plaintiff's first and second premises, if they were conceded.

The conduct of the defendant, as collector, whether he pursued the right line of his duty, or departed from it and became a trespasser, and if a wrongdoer for what damages he became responsible, are matters to be adjudged by the laws in force defining his duties as collector at the time when the plaintiff made his protest against the conduct of the collector; not by the error of the Secretary of the Treasury, whom the law had put over him as a light, a guide, and a buckler; nor by laws which did not take effect until months after the plaintiff's protest; nor by the after voluntary act of the plaintiff himself, of omission or commission.

. The fourth instruction moved relates to the sum of $38.86, twice tendered to the plaintiff, and twice refused.

This is certainly a small business, a little matter, a very trifling matter, wherewith the plaintiff hath elected, (after two tenders and refusals,) to engage the time and attention, first of the Circuit Court of the United States, by an action originally brought therein, whose cognizance, as defined by law, is intended to be limited to cases "where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars," and secondly, the time and attention of this court, whose appellate jurisdiction in such like cases is, by the law intended to be confined to

matters in dispute exceeding the sum or value of two thousand dollars, exclusive of costs.

If the plaintiff had truly stated his said demand, for the said sum of thirty-eight dollars eighty-six cents, neither the Circuit Court nor this court could have held cognizance of the plea. But by refusing this sum when tendered, and by mixing this matter with his protest about the warehousing, and, by stating his demand at five thousand dollars, he has compelled the Circuit Court and this court to hold cognizance of his complaint.

If the jury had found for the plaintiff the sum of thirty-eight dollars eighty-six cents, then, according to the twentieth section of the Judiciary Act of 24th September, 1789, " he shall not be allowed, but, at the discretion of the court, may be adjudged, to pay costs."

When, upon the facts given in evidence, the plaintiff moved this fourth instruction, that " he was entitled to recover the sum of $36.86," he thereby confined and dwindled his demand to that sum ; the court was called to adjudicate as to that sum ; to lend its assistance to the plaintiff to recover that sum and no more ; a matter far beneath the cognizance of that court.

Mr. Chief Justice TANEY delivered the opinion of the court.

This is an action brought by the plaintiff against the collector of the port of New Bedford, for refusing to permit the plaintiff to enter for warehousing at Wareham sundry cargoes of coal, imported from Pictou, Nova Scotia, which were shipped for Wareham, and arrived in the months of September and October, 1846. Wareham was a port of delivery in the collection district of which New Bedford was the port of entry ; and the collector, in refusing to permit them to be entered for warehousing at Wareham, acted under the directions of the Secretary of the Treasury. The plaintiff was required to pay in cash the duties imposed by the act of 1842, before the permit for landing at Wareham was granted. And this suit is brought to recover the difference between the duties paid and the duties to which the coal would have been liable if it had been warehoused at Wareham and remained in store as the plaintiff desired until the reduced tariff went into operation. The case depends upon the construction of the Warehousing Act of August 6, 1846.

The law is framed in very general terms, referring to other laws for some of its regulations ; and containing but few specific directions as to the manner in which it should be carried into execution. And it authorizes the Secretary of the Treasury to make from time to time such regulations, not inconsistent with law, as might be necessary to give full effect to the provisions of

the act, and secure a just accountability under it. This mode of legislation has naturally led to some ambiguity, and has given rise to this controversy.

The act went into operation on the day it was approved by the President. And the plaintiff insists that, under its provisions, he was entitled, as soon as it passed, to land his goods at the port of delivery upon bonding for the duties; and to have them placed there in store in order to avail himself, if he thought proper, of the reduced tariff, which took effect on the 2d of December, in the same year. The 6th section of the Tariff Act of July 30, 1846, which passed a few days before the Warehousing Act, of which we are now speaking, provided that all goods imported after the passage of that law, and remaining in the public stores on the 2d of December following, when the act went into operation, should be subject to no other duty upon entry thereof than if they had been imported after that day.

In expounding the Warehousing Act, it must be borne in mind, that it was not passed for the purpose of enabling the importer to avail himself of the reduced rates of duty. It is a part of the general and permanent system of revenue; and its evident object is to facilitate and encourage commerce by exempting the importer from the payment of duties, until he is ready to bring his goods into market. The opportunity it afforded of taking advantage of the reduced rates of duty was an accidental circumstance arising from the time at which it happened to be passed. The provisions in the 6th section of the Tariff Act of July 30, 1846, had no reference to goods entered for warehousing. There was no law at that time which authorized the importer so to enter them. And although the Warehousing Act, which passed a few days afterwards, enabled the importer, by warehousing his goods, to take the benefit of the provisions of the previous law, yet it was not passed for that purpose. And it must be regarded and interpreted, not as an act passed for a temporary purpose, or to meet a change of tariff, but as one intended to be equally applicable to goods imported after the 2d day of December, as to goods imported between the 30th of July and that time. The plaintiff had the same legal rights in this respect at the time he offered to enter his coal at Wareham as an importer of the present day, and nothing more; and no greater advantages were intended to be given him by the Warehousing Act.

Previous to the passage of this act no goods, chargeable with cash duties, could be landed at the port of delivery until the duties were paid at the port of entry. The importer had no right to land them anywhere until they had passed through the custom-house. And they could not be landed at the port of delivery without the permit of the proper officer at the port of

entry. This permit in effect delivered them to the owner to be landed under the usual inspection, and sold and disposed of as he thought proper; and the permit could not be granted unless the duties had been paid.

There could, therefore, but rarely be any necessity for public stores or warehouses at a port of delivery, before the passage of the Warehousing Act.

It was otherwise at ports of entry. The importer himself had no right to land them even at a port of entry before the duties were paid. But when the entry at the custom-house was imperfect, for want of the proper documents, or where the goods were damaged in the voyage, and the duties could not be immediately ascertained; or the cash duties were not paid after the forms of entry had been complied with; in all of these cases the collector was directed, by existing laws, to take possession of such goods, and place them in public stores, and retain them until the duties were paid. And as all of this was to be done at the port of entry, public stores were necessary at such ports; and they had accordingly been provided for by law, before the passage of the Warehousing Act.

Now, the Warehousing Act, so far as the landing and storing of goods is concerned, places goods entered for warehousing upon the same footing with goods upon which the duties have not been paid. It provides, that in all cases of failure or neglect to pay the duties within the period allowed by law to the importer, to make entry thereof, or whenever the owner, importer, or consignee, shall make entry for warehousing in the manner directed in the act, the collector shall take possession of the goods and deposit them in the public stores; or in other stores to be agreed on by the collector or other chief officer of the port, and the importer of the goods to be secured in the manner provided for in the act of 1818 relative to the warehousing of wines and distilled spirits. The warehoused goods, therefore, are to be taken possession of by the same officer and stored, and treated like goods upon which the importer had failed to pay duty. And, as the latter were necessarily to be taken possession of at the port of entry, and accustomed to be stored there, the natural inference from this association is, that the law contemplated the storage of warehoused goods at the same place, and did not mean to give the importer a right to store them at any port of delivery to which he might have chosen to ship them. The Warehousing Act gives him no peculiar privileges over the importer of goods directed to be placed in the public stores because the duties were not paid; nor any greater right to select for himself the place of storage.

The 2d section of the act strengthens this construction of the

1st section. It provides that warehoused goods, deposited in the public stores in the manner provided in the 1st section, might be withdrawn and transported to any other port of entry; and directs that the party should give bond for the deposit of them in store, in the port of entry to which they shall be destined. The use of the words "ports of entry," in this provision, implies that they were to be stored in a port of that description in the first instance, and to be deposited again in a like port, if they were transported coastwise.

Again, the directions as to the manner in which they are to be secured while they remain in the store, and to be delivered to the party when he is entitled to receive them, leads to the same conclusion. They cannot be withdrawn without a permit from the collector and naval officer of the port at which they are stored. And as there is no naval officer appointed or needed at a port of delivery, this provision would appear to have contemplated the storage at a port of entry and not of delivery. There are certain expressions in the law which may be applied to a port of delivery as well as of entry. But they were introduced for the purpose of authorizing the Secretary of the Treasury, under the power to make regulations, to have suitable storehouses to provide at a port of delivery, when the nature and importance of the trade might require it.

The act of 1799, c. 22, § 21, (1 Stat. at Large, 642,) authorizes the collector, with the approbation of the principal officer of the Treasury Department, to employ proper persons as weighers, gaugers, measurers, and inspectors at the several ports within his district; and also, with the like approbation, to provide, at the public expense, storehouses for the safe-keeping of goods, and such scales, weights, and measures, as may be necessary. The secretary and collector were, therefore, under this law, to determine where storehouses were necessary; and might provide them at a port of delivery, if they believed the interests of the public and of commerce demanded it. But the law confided it to their discretion, to determine whether they should or should not be provided at any particular port of delivery; and the Warehousing Act has not changed the law in this respect, and does not require that there should be public storehouses at every port of delivery at which the importer might wish to warehouse his goods.

The record shows, that after this transaction took place, the secretary did authorize goods to be warehoused at Wareham. But the question before us is not whether he might not have authorized it before; but whether, independently of any regulation by the secretary, the importer had not an absolute right, as soon as the law was passed, to land his goods at the port of

26 *

delivery to which they were destined, and store them there, upon giving the bonds which the law requires. We think he had not, and that the right, given under the Warehousing Act, was confined to a port of entry, unless extended, by regulation of the secretary, to a port of delivery.

Indeed, the execution of the law would be impracticable under the construction contended for by the plaintiff. For it directs that the bond to be taken on the entry for warehousing, shall be prescribed by the secretary; and it is made his duty to make regulations to carry the law into full effect, and secure a just accountability. These things required time; and the collector could not act without them. Yet, if the plaintiff's construction be the correct one, his right to enter his coal for warehousing at Wareham was as absolute the day after the law passed as it was when he offered to make the entry. For if the law gave him the right, independently of any regulations by the secretary, he was not bound to wait until they were made and the form of the bond prescribed; but might have demanded his rights on the 7th of August, and sued the collector if he failed to obtain them. It is evident that Congress could not have intended to confer upon the importer this right. Nor can the law receive that construction without rejecting the provisions which authorize the secretary to prescribe the form of the bond, and to direct the manner in which the act was to be carried into effect. These provisions, in relation to the power of the secretary, are important, and were intended to guard the public, against any abuse of the privileges which the Warehousing Act gave to the importer.

Moreover, many of the ports of delivery are at places where the trade is trivial and unimportant, and where it would be difficult to procure suitable storehouses for a cargo unexpectedly arriving and demanding to be warehoused. In many of them there are not a sufficient number of officers to superintend the landing and warehousing of a cargo of an ordinary ship, and guard it afterwards from being improperly withdrawn. The Warehousing Act does not authorize the appointment of additional officers, at ports of delivery, nor provide for any additional expenses to be incurred by the public in carrying it into execution. And if the collector is bound to grant a permit to land the goods, at any port of delivery which the importer may select for his shipment, it is easy to foresee the abuses to which it would lead; and the frauds that might be practised under it, Congress can hardly be presumed, from any general or ambiguous language, to have intended, in this law, to dispense with all the safeguards which had been so carefully provided and preserved in previous acts. We think neither its words nor its

manifest object will justify such a construction, and that the collector was right in refusing the permit to the plaintiff to land and warehouse the coal in question at Wareham.

As regards the small balance of the plaintiff's deposit which remained in the collector's hands after the payment of the legal duties, it is no ground for reversing the judgment of the Circuit Court. The defendant offered to pay it, but the plaintiff refused to receive it. The money placed in the hands of the collector for the estimated duties was a deposit in trust for the United States for the amount that should be found actually due; and for the plaintiff for the balance, if any should remain after the duties were paid. And as the plaintiff refused to receive this balance when tendered, it continues a deposit in the hands of the defendant with the plaintiff's consent; and he cannot subject the collector to the costs and expenses of a suit until he can show that it is wrongfully withheld.

The judgment of the Circuit Court is therefore affirmed with costs.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Massachusetts, and was argued by counsel, on consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.