# BARNEY *v.* RICKARD.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
SOUTHERN DISTRICT OF NEW YORK.

No. 213. Argued January 31, 1895 — Decided April 1, 1895.

Under the act of February 26, 1845, c. 22, 5 Stat. 727, a protest against the
exaction of duties on imported goods, in order to be available for recov-
ering the amount of duties illegally exacted, must be made at or before
their actual payment; and when the importer deposits with a collector
an amount supposed to be sufficient to pay the duties, subject to future
liquidation, and receives the goods, and on such liquidation an amount is
found to be due the importer as overpayment and is refunded to him,
a protest made after the deposit and receipt of the goods, but before
the liquidation, is too late and is of no avail.

In an action, tried in 1890, to recover duties alleged to have been illegally
exacted in 1861 on an importation of bareges, grenadines, maretz, and
merinos, the plaintiff introduced no samples of the imported goods, nor
any evidence as to their loss or destruction, and gave no reasons why
they were not preserved and produced. He showed to one of his wit-
nesses samples of grenadines, bareges, etc., but without connecting
them in any way with the importations, and questioned the witness con-
cerning them. *Held*, that their admission tended to mislead the jury, and
was error; and that such evidence came within the rule that "a fact
which renders the existence or non-existence of any fact in issue prob-
able by reason of its general resemblance thereto, and not by reason of its
being connected therewith, is deemed not to be relevant to such fact."

THE case is stated in the opinion.

*Mr. Assistant Attorney General Whitney* for plaintiff in
error.

No appearance for defendant in error.

*Mr. S. F. Phillips* and *Mr. F. D. McKenney*, by leave of
court, filed a brief on behalf of defendant in error.

MR. CHIEF JUSTICE FULLER delivered the opinion of the
court.

This was an action to recover duties alleged to have been paid on some thirty-nine importations made during the years 1863 and 1864 from France into the port of New York of veil bareges, plain bareges, crepe maretz, grenadines, and merinos. The action was commenced January 24, 1866, and tried in May, 1890. The trial resulted in a verdict and judgment for the importers on all of the articles mentioned, except the plain bareges.

These questions are presented by the record: First, whether the protest complied with the requirements of the act of February 26, 1845, c. 22, 5 Stat. 727. Second, whether certain samples were properly admitted in evidence for the consideration of the jury.

1. Two of the importations are referred to by the government as bringing out the first question with distinctness, both of which were made prior to June 30, 1864. The record reads as to these two importations as follows:

"It appeared that in case of the importation covered by Exhibit 28, at the time of the entry thereof, February 15, 1864, the plaintiffs' testator deposited with the defendant, as collector of customs, an amount of money which was equal to an amount of duties thereon at the rate of about 40 per centum ad valorem; or, in other words, an amount in excess of the amount of duties subsequently ascertained on liquidation of the entry; that upon such ascertainment or liquidation the defendant, as said collector, retained out of said deposit a certain sum as duties, and thereafter returned the excess to plaintiffs' testator; that the entry was so liquidated, and the plaintiffs' testator notified of such liquidation May 16, 1864; that the excess of the amount deposited with the defendant, as said collector on February 15, 1864, over and above the amount of duties actually found due on liquidation and retained as above, was refunded to the plaintiffs' testator May 23, 1864; that the plaintiffs' testator obtained possession of each and every part of said importation on or prior to February 26, 1864, and that the protest relating to said importation was dated and endorsed March 4, 1864. . . .

"That in case of the importation covered by Exhibit 38,

at the time of the entry thereof, April 20, 1864, the plaintiffs' testator deposited with the defendant, as collector of customs, an amount of money which was equal to an amount of duties thereon, at the rate of above 40 per centum ad valorem; or, in other words, an amount in excess of the amount of duties subsequently ascertained on liquidation of the entry; that upon such ascertainment or liquidation, the defendant, as said collector, retained out of said deposit a certain sum as duties, and thereafter returned the excess to plaintiffs' testator; that the entry was so liquidated and the plaintiffs' testator notified of such liquidation May 16, 1864; that the excess of the amount deposited with the defendant, as said collector, on April 20, 1864, over and above the amount of duties actually found due on liquidation and retained as above, was refunded to the plaintiffs' testator May 19, 1864; that the plaintiffs' testator obtained possession of each and every part of said importation on or prior to April 30, 1864, and that the protest relating to said importation was dated May 3, 1864."

Both sides having rested, defendant's counsel moved the court to direct the jury to find for the defendant as to each of the importations covered by Exhibits 28 and 38, on the ground that the payment of the duties sought to be recovered as to each was paid on or about the dates of the entries, and the respective protests were not made until after such payments. This motion the court denied, and defendant excepted. Defendant's counsel also moved the court to direct the jury to find for defendant as to the importations covered by Exhibits 28 and 38, on the ground that if the date of the payment was not the date of the entry, and was the date of the liquidation of the duties and the notification of such liquidation, Rickard obtained possession of the goods without such payment, or in other words, did not pay the duties to obtain such possession. This motion the court denied, and defendant excepted.

It will be perceived as to Exhibit 38 that the record states that Rickard at the time of the entry, April 20, 1864, " deposited with the defendant, as collector of customs, an amount of money which was equal to an amount of duties thereon, at the rate of above forty per centum ad valorem, or, in other words,

an amount in excess of the amount of duties subsequently ascertained on liquidation of the entry;" that he received the goods April 30; that he did not protest until May 3; that the entry was liquidated May 16, and that the collector, finding that there had been an overpayment, refunded the difference between the amount finally decided on by him as correct and the amount as paid by Rickard, May 19.

The contention of the government is that if the actual transfer of the money on April 20 constituted its payment, that payment was not made under protest; and that if the actual payment is to be regarded as having been made when the entry was liquidated, or the excess was repaid, then it was not made under duress, as Rickard had already got his goods.

Actions against collectors for money had and received depended originally on common law principles. The money was regarded as paid under duress in order to obtain possession of the merchandise detained by the collector, and the protest evidenced the fact that the payment was involuntary, and warned the collector not to pay the money into the Treasury.

The history of legislation on the subject is given by Mr. Justice Bradley, in *Barney* v. *Watson*, 92 U. S. 452, and more in detail in the brief for the government.

By the act of March 2, 1799, c. 22, § 49, 1 Stat. 627, 664, the collector (jointly with the naval officer or alone where there was none) was required to make "a gross estimate of the amount of the duties on the goods, wares, or merchandise to which the entry of any owner or consignee, his or her factor or agent," related, to be endorsed upon such entry and signed by the officer or officers making the same; "and the amount of the said estimated duties having been first paid, or secured to be paid, pursuant to the provisions of this act, the said collector shall, together with the naval officer, where there is one, or alone where there is none, grant a permit to land the goods, wares, and merchandise, whereof entry shall have been so made, and then, and not before, it shall be lawful to land the said goods." Rev. Stat. § 2869. By section 4 of the act of May 28, 1830, c. 147, 4 Stat. 409, 410, a ten-day bond on delivery to return the goods on call was provided for, but this

was in addition to payment or security therefor, and intended for further security if the duties overran the estimated amount.

In *Elliott* v. *Swartwout*, 10 Pet. 137, the principle was affirmed which had been established by previous authorities, that money paid to a collector for duties illegally demanded, if paid under compulsion, in order to get possession of the goods or to prevent their seizure for duties, might be recovered in a common law action against the collector, provided the payment was made under protest and with full notice of the intent to sue, so that the officer might protect himself by retaining the money in his possession ; but that a payment voluntarily made without such protest could not be recovered back. Because of the embarrassments which ensued in consequence of the large amount of duties withheld from the public Treasury by Swartwout, the defendant in that case, a section was inserted in the civil and diplomatic appropriation bill of March 3, 1839, c. 82, § 2, 5 Stat. 339, 348, which read as follows : " That from and after the passage of this act, all money paid to any collector of the customs, or to any person acting as such, for unascertained duties or for duties paid under protest against the rate or amount of duties charged, shall be placed to the credit of the Treasurer of the United States, kept and disposed of as all other money paid for duties is required by law, or by regulation of the Treasury Department, to be placed to the credit of said Treasurer, kept and disposed of ; and shall not be held by said collector, or person acting as such, to await any ascertainment of duties, or the result of any litigation in relation to the rate or amount of duty legally chargeable and collectible in any case where money is so paid ; but whenever it shall be shown to the satisfaction of the Secretary of the Treasury, that in any case of unascertained duties or duties paid under protest more money has been paid to the collector or person acting as such than the law requires should have been paid, it shall be his duty to draw his warrant upon the Treasurer in favor of the person or persons entitled to the overpayment, directing the said Treasurer to refund the same out of any money in the Treasury not otherwise appropriated."

By the act of August 30, 1842, c. 270, § 12, 5 Stat. 548, 561, the duties were required to be paid in cash.

At January term, 1845, it was held by this court in *Cary* v. *Curtis*, 3 How. 236, that the second section of the act of 1839 took away the importer's right of action. The argument was that as thereby the collector was required to pay moneys collected into the Treasury without regard to protests filed or without awaiting the result of suits brought, he was converted "into the mere bearer of those sums to the Treasury of the United States, through the presiding officer of which department they were to be disposed of in conformity to the law." This decision was referred to with approval in *Curtis* v. *Fiedler*, 2 Black, 461, 478, and the court said: "The law never implies a promise to pay unless some duty creates such an obligation, and more especially it never implies a promise to do an act contrary to duty or contrary to law. Collectors under the act referred to were required to pay all moneys received for unascertained duties or for duties paid under protest into the Treasury of the United States, and consequently this court held that in a case arising under that law, where that duty had been performed by the collector, the law would not imply a promise on his part to pay the same back to the importer, because he was under no obligation to pay the money twice, and to have paid the same back to the importer in the first place would have been contrary to his official duty as prescribed by an act of Congress."

Thereupon the act of February 26, 1845, c. 22, 5 Stat. 727, was passed, which provided: "That nothing contained in [said section] shall take away, or be construed to take away or impair, the right of any person or persons who have paid or shall hereafter pay money, as and for duties, under protest, to any collector of the customs, or other person acting as such, in order to obtain goods, wares, or merchandise, imported by him or them, or on his or their account, which duties are not authorized or payable in part or in whole by law, to maintain any action at law against such collector, or other person acting as such, to ascertain and try the legality and validity of such demand and payment of duties, and to have a right to a trial

by jury, touching the same, according to the due course of law. Nor shall anything contained in the second section of the act aforesaid be construed to authorize the Secretary of the Treasury to refund any duties paid under protest; nor shall any action be maintained against any collector, to recover the amount of duties so paid under protest, unless the said protest was made in writing, and signed by the claimant, at or before the payment of said duties, setting forth distinctly and specifically the grounds of objection to the payment thereof."

Thus the common law right of action was restored, but the protest was required to be in writing and not oral as before allowed. *Swartwout* v. *Gihon*, 3 How. 110.

This was the statute in existence regulating payments under protest upon importations of dutiable goods at the time of the importations under consideration. The act of March 3, 1857, c. 98, § 5, provided for notice of dissatisfaction within ten days after entry, but that act only applied to cases where the question was whether the goods were or were not subject to duty at all. 11 Stat. 192, 195. The act of June 30, 1864, gave ten days after liquidation for such notice. Rev. Stat. § 2931.

By the act of August 6, 1846, c. 84, 9 Stat. 53, the right to secure the duties was restored in case of entries for warehousing, by giving bond in double the amount of the duties as estimated; and in *Tremlett* v. *Adams*, 13 How. 295, 303, Mr. Chief Justice Taney made these observations in respect of that act : " Previous to the passage of this act no goods, chargeable with cash duties, could be landed at the port of delivery until the duties were *paid* at the port of entry. . . . The permit could not be granted unless the duties had been paid. . . . The importer himself had no right to land them, even at the port of entry, before the duties were *paid*. But when the entry at the custom-house was imperfect, for want of the proper documents, or where the goods were damaged in the voyage, and the duties could not be immediately ascertained, or the cash duties were not paid after the forms of entry had been complied with ; in all of these cases the collector was directed, by existing laws, to take possession

of such goods and place them in public stores, and retain them until the duties were paid."

As we have said, the act of 1799 provided that on entry the duties should be " first paid, or secured to be paid." The act of August 30, 1842, required, however, that " the duties on all imported goods, wares, or merchandise, shall be paid in cash," or otherwise the goods should be stored and sold. The act of August 6, 1846, amended the act of 1842, and while preserving the provision that the duties should be paid in cash and that goods upon which the duties were not paid should be deposited in public store and sold by the collector, established also the system of entries for warehousing, by which the duties, instead of being paid, could be secured by bond with sureties in double their amount in such form as the Secretary of the Treasury should prescribe. None of the statutes provided for a deposit. Either the estimated duty must be paid in cash or a warehouse bond must be given. Otherwise the goods could not be entered, but would be put in the public store by the collector as unclaimed.

We assume that the procedure in estimating duties was for the collector, taking the invoice as true, to ascertain the amount which *prima facie* the importer should pay, and this he was compelled to pay in cash forthwith unless he entered the goods for warehousing. Ordinarily the duties finally liquidated were the same as those originally estimated, but the collector might for various reasons find that the estimated duty had to be changed, and a further payment or refund made. In the case at bar it is stated that the amount originally required to be paid was " about" or " above " forty per cent ad valorem, " or, in other words, an amount in excess of the amount of duties subsequently ascertained on liquidation of the entry," but that cannot be held to mean that, instead of making " a gross estimate of the amount of the duties " as required by law, the collector named a mere arbitrary figure. On the contrary, as the presumption is in favor of the collector and the record shows that he assessed the duties at thirty per cent ad valorem and two cents per square yard, it must be concluded that he so estimated them, but

that the amount required overran the result of subsequent and accurate calculation. Besides, as, when the protest came to be made, the importer claimed that the rate should have been thirty-five per cent ad valorem, the statement may have been inserted as establishing that thirty per cent ad valorem plus two cents per square yard exceeded thirty-five per cent ad valorem.

The question arises then whether, when the duties were estimated and the amount delivered by Rickard to the collector, he should not then have protested if he desired to contest the legality of the exaction. The statute said that an action could not be maintained against the collector, except under protest, and "unless the protest was made in writing, and signed by the claimant, at or before the payment of said duties." Without the protest the money paid was not illegally exacted, and, if not, could not be recovered back. *Lawrence* v. *Caswell*, 13 How. 488, 496. If when final liquidation took place there had been no change in the amount determined or the basis thereof, could he then protest? If the amount had been increased and he protested, could he recover back more than the amount so added? Having obtained his goods by the delivery of the money without protest, could he say after that that it was paid compulsorily in order to get possession of them?

It seems to us that these protests came too late, if the duties were estimated according to law, and that this was distinctly ruled in *Barney* v. *Watson*, 92 U. S. 449.

In that case the goods were entered December 24, 1863. The collector put the duties at the sum of $8840.93, arrived at by the addition of a specific duty to the duty ad valorem, and ascertainable by the rule applied. The amount thus determined was delivered to the collector. On liquidation of the entry, the collector fixed the amount at $10,023.64, leaving a balance of $1187.71. This liquidation of the entry was made March 11, 1864, and the additional duty was paid and the protest made March 24, 1864. The question between the importers and the collector related to the proper rate of duty upon certain flannels. These the importer classified at 35 per

cent ad valorem, while the collector classified them at 35 per cent ad valorem plus a specific duty of eighteen cents per pound. Mr. Justice Bradley, delivering the opinion, states that there were 7984 pounds of these goods, so that the specific duty was $1427.12. This difference was partly represented by the payment, under protest, of $1182.71, but a portion of it was represented by part of the $8840.93 paid at the time of the entry of the goods. This court held that as to the sum illegally exacted in December, the plaintiff must fail to recover, because he had then failed to protest, and Mr. Justice Bradley said : " The question in the case, therefore, really was, whether the importers made their protest in accordance with the act of 1845, namely, at or before paying the duties complained of. It is not denied that they did this so far as relates to the additional charge of $1182.72, but they claim a return of more than this; and under the charge of the court they obtained a verdict for nearly double this amount, which would include some portion of the money paid by them without protest when the goods were first entered. This was erroneous."

The payment of the $8840.93 was payment of the estimated duties, just as in this case, although Mr. Justice Bradley speaks of it as a " payment on account." So far as disclosed by this record the importers knew in this case as in that, upon what basis the collector proceeded as to amount and rate, and if in this case as in that an additional amount had been required to be paid and they had protested, such additional amount might have been recovered back, if otherwise improperly exacted, because it would have been paid under protest at the time of the payment, and the importers could not have been held to have acquiesced by not protesting before.

But it does not follow that the protest can be given effect as of the prior date when the amount of the estimated duties was paid over or deposited, or that the entire amount must be considered as paid under duress at the later date when possession of the goods had already been surrendered.

Hence, in *Crocker* v. *Redfield*, 4 Blatchford, 378, 380, Mr. Justice Nelson, on the question of " estimated duties," held as

follows: " As it respects the excess of duty claimed to be recovered upon the shipment of jute, it is a sufficient answer to say that the protest is defective. It appears, on the face of it, that the money was paid, and in the hands of the collector, before the protest was made against the payment of the duty and the penalty. There is no date to it, but the inference is unavoidable from the facts stated in it. Indeed, a balance is still in the hands of the collector of $92.85. · It is said that the money was only deposited with the collector as a security for the payment of the duties when ascertained, and that the application did not take place till the ascertainment of the duties. Admitting this to be so, I do not agree to the consequence claimed. The money deposited was to be applied by the collector to the duties, and it cannot be said, after this, that it was paid compulsorily in order to get possession of the goods. The protest, after the duties were ascertained, came too late."

Mr. Justice Nelson participated in the decision of *Marriott* v. *Brune*, 9 How. 619, in which it is supposed a contrary view was indicated. That case was decided by Chief Justice Taney on circuit. *Brune* v. *Marriott*, Taney Dec. 132. Plaintiffs paid the estimated duties in cash on certain importations of sugar at the port of Baltimore in 1847, which were thereupon landed and examined by the weighers and gaugers, which examination disclosed that the goods had suffered from leakage. Suit was " brought to recover back so much of the money as was paid for duties upon that portion of the cargo which was lost on the voyage by leakage." Plaintiffs did not protest until after the occurrences above mentioned and prior to the final liquidation of the duties. Judgment was unquestionably correctly given for plaintiffs. The goods were not intended to be left in warehouse under the act of August 6, 1846, and payment of the duties was made while the goods were still aboard the ship, and the leakage not ascertained until after they were put ashore. The payment therefore was not made under a mistake of law, but under a mutual mistake of fact, since the importers and collector both assumed that the amount of sugar and molasses named in the invoices was to be unladed.

Clearly there was nothing to show dissatisfaction in the first instance, but when the fact developed that there was a deficiency in respect of which duties should not have been exacted, protest was made as to the amount paid on goods which were lacking, but not in respect of any other part of the importations. The Chief Justice said, however: "The protest is not required to be made on or before the payment of what are called the estimated duties, for this payment is necessarily regulated by the invoice quantity as well as the invoice price. The importer cannot at that time know whether there has been any loss by leakage, nor can he know, after it has been ascertained by the weigher and gauger, whether the collector will exact duties upon the amount stated in the invoice. The protest is legally made when the duties are finally determined and the amount assessed by the collector, and a protest before or at that time is sufficient notice, as it warns the collector, before he renders his account to the Treasury Department, that he will be held personally responsible. . . . The payment of the money upon the estimated duties is rather in the nature of a pledge or a deposit than a payment, for it remains in the hands of the proper officer, subject to the final assessment of the duties, and if more has been paid than is due, which is most commonly the case, the surplus belongs to the importer, and is returned to him. Upon the whole, the court is of opinion . . . that the protest of April 9, 1847, covers all the cargoes where duties had not before been finally assessed and adjusted by the collector."

And in the case on error in this court, 9 How. 619, Mr. Justice Woodbury, speaking for the court, remarked that "where the duties had not been closed up in any cases when the written protest in April was filed — though the preliminary payment of the estimated duties had taken place — the court justly considered the protest valid; because till the final adjustment the money remains in the hands of the collector, and is not accounted for with the government, and more may be necessary to be paid by the importer."

Without analyzing the reason given, in view of the lan-

guage of the statute, and the decisions in *Cary* v. *Curtis* and *Curtis* v. *Fiedler*, these observations must be read in the light of the facts of the case. The protest was confined to the duties paid on the deficiency. Upon discovery of the fact of loss by leakage, the importers became entitled to a repayment, and the action of the collector was equivalent to a then decision that they were not so entitled, against which decision they protested. Up to that time there was no ground for a protest, and when the necessity therefor appeared it was made at the time of the particular payment complained of and was given that effect, a very different thing from carrying it back to the previous payment when there was no complaint.

In *Moke* v. *Barney*, 5 Blatchford, 274, Mr. Justice Nelson held that the requirement of the act of February 26, 1845, of a written protest in order to sustain an action against the collector to recover duties back, applied to the payment of unascertained as well as ascertained duties or " duties paid under protest; " and he there said that the protest was seasonably made, if made at the time of the final liquidation. In that case the question arose in reference to an allowance for draft, and, just as in the instance of leakage, the notice of dissatisfaction could not be given until the ground for dissatisfaction was disclosed.

In *Erskine* v. *Van Arsdale*, 15 Wall. 75, the ruling was that taxes illegally assessed and paid may always be recovered back if the collector understands from the payer that the taxes are regarded as illegal and that suit will be instituted to compel the refunding of them. It is not necessary to discuss the cases in relation to the existence of such duress or necessity as make a payment involuntary. The intention of the statute was that recovery could be had if proper notice of dissatisfaction was given at the proper time, and, as already remarked, in *Brune* v. *Marriott* the payment of so much of the duties as was subsequently disputed was really made under misapprehension of fact. In *Barney* v. *Watson* the same rule was applied to the additional amount required on final liquidation, but the protest was distinctly held not to cover that proportion of the amount assessed illegally which had been included in the prior payment.

In *Davies* v. *Miller*, 130 U. S. 284, 287, 289, it was held that under the act of 1864 the protest could be made at any time after entry, it having been decided in the court below that it could not be made before final liquidation, but whether it could be made after payment was not a question presented for consideration; and *Marriott* v. *Brune* was referred to as generally regarded and acted on as laying down a general rule establishing the validity of prospective protests as it was in *Schell's Executors* v. *Fauché*, 138 U. S. 562. No point was ruled in these cases inconsistent with the conclusion at which we have arrived, which is that these protests were not in time. We think this results from the language of the statutes, the facts disclosed by the record and the decision in *Barney* v. *Watson*, in which the precise question was squarely presented.

It is true that the evidence of a custom-house broker was adduced to the effect that where there was any uncertainty as to the correct rate of duty it was the practice, at the time of the trial, to take from the merchant what was known as a deposit intended to more than cover the exact amount of duty; but we do not understand this practice, if it prevailed prior to the act of June 30, 1864, as dispensing with the necessity of the collector making his estimate of the duties by fixing in dollars and cents the amount which *prima facie* the importer should pay, exacting, if in doubt, the higher of two possible rates.

In this case the collector claimed thirty per cent ad valorem and two cents per square yard. The importer must be held to have known whether this classification was objectionable or not, and was not entitled to wait until final liquidation to make up his mind whether he would protest against that classification, and on what ground he would put the protest. In not protesting he accepted the rates as they stood and took the chances that they might be lowered, while if they were increased a protest would then be effective as to such increase, or if the basis of the exaction was changed. There was no increase and apparently no change. The reasonable inference is that the ground of the refund was some inaccuracy in the computations.

And it might well be held, on this record, that even if the money could be said to have been paid at the time of the final liquidation because not applied until then, it was not paid in order to get possession of the goods. See under subsequent statutes: *United States* v. *Schlesinger*, 120 U. S. 109; *Porter* v. *Beard*, 124 U. S. 429; *Merritt* v. *Cameron*, 137 U. S. 542; *Cadwalader* v. *Partridge*, 137 U. S. 553; *Schoenfeld* v. *Hendricks*, 152 U. S. 691.

2. Among the goods imported were certain plain bareges and grenadines, each composed of a silk warp and worsted weft. No samples of these imports, or any similar goods imported by Rickard, were put in evidence. A sample was shown to one of the witnesses, (and other similar evidence was adduced, not differing from that of this witness,) who testified that it "was known in this country in 1861 as a grenadine or a barege." This was objected to, because "in no way connected with any goods in suit," but was admitted as Exhibit 44, and defendant excepted. The witness was then shown another sample, as to which he testified that it "was a barege, but it might be called a grenadine sometimes." This was also admitted under exception and marked 44. The next sample "was a grenadine, what they call an iron barege, or an iron frame barege; . . . that the real name for it was, in French, canevas, because they resembled canvas; that when they came here they got the name of iron bareges; that it was not a species of grenadine; it was a grenadine, only it had a disposition of threads more or less heavy or harsh." This was likewise admitted, under exception, as Exhibit 45. The witness further testified that "Exhibit 44 did not differ at all from a plain barege, a silk and worsted barege as known in trade and commerce in 1861, '2, '3, and '4; it was simply a barege; that Exhibit 45 was a grenadine, and in 1862, '3, and '4 was known in trade and commerce in this country as an iron barege; that it did not differ in any respect from what was known in trade and commerce in this country in 1862, '3, and '4 as grenadine; . . . that he did not know anything about the bareges in this suit; that there was a great variety of grenadines; . . . that if a grenadine

were of a quality .worth 65 cents it would not represent at all. one that was worth $1.25; . . . that he did not know anything about the grenadines in this suit." The jury found for the plaintiffs as to the grenadines. There was no evidence adduced of the loss or destruction by Rickard of the samples, nor did the lapse of time raise any presumption of such loss or destruction. The protest for purposes of suit was made not long after the importations, and the action was commenced in 1866 by the same attorney who was spared to try the case nearly a quarter of a century afterwards. The goods were not perishable in nature and no reason was given why the necessary samples were not preserved. It must be assumed that all material testimony bearing upon these exhibits was incorporated in the bill of exceptions, and we cannot discover therefrom that the articles imported by Rickard under the name of grenadines were iron bareges or claimed by him to be such. Unless this were so, the sample numbered 45 was not relevant. Nor does it appear that there was any evidence to connect the samples introduced with the importations in question, or fairly tending to establish substantial identity between them and the importers' goods. We are of opinion that these samples were incapable of raising any reasonable presumption or inference as to whether the goods were properly classified, and that their admission tended to mislead the jury. And if there were some evidence of resemblance, still we think as the record stands the proof came within the rule laid down by Mr. Justice Stephens: "A fact which renders the existence or non-existence of any fact in issue probable by reason of its general resemblance thereto, and not by reason of its being connected therewith, . . . is deemed not to be relevant to such fact. . . ." Dig. Ev. art. 10.

*Judgment reversed and cause remanded with a direction to grant a new trial.*