(C. D. 728)

SUCREST CORP. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided February 11, 1943)

*Stroock & Stroock* (*Milton Socolof* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue*, special attorney), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

EKWALL, Judge: These three protests arose from the importation at the port of Philadelphia in August and September 1939, of two cargoes of raw sugar from the Republic of Cuba, both of which cargoes were entered in bond for warehousing. All the sugar has long since been withdrawn for consumption. The issue in protest 46411–K is quite different from that in the remaining two protests, but as the three cases were consolidated for trial and were submitted for decision on one stipulation of fact, we shall pass on them in one opinion.

Taking up protest 46411–K first, we find it to be, in terms, against the "refusal" of the collector of customs at Philadelphia to "accept and pass" a withdrawal entry for consumption covering all the sugar remaining in warehouse on the morning of September 12, 1939, from the importation ex-*Orion*, the vessel which had arrived in August. Incidentally, this protest relates only to sugar that arrived on the *Orion*, warehouse entry 3291. The episode that gave rise to the protest is described in the protest, in the stipulation of fact upon which

the various protests have been submitted for decision, and in the briefs of counsel substantially as follows: On September 12, 1939, at 10:30 a. m. according to the protest—at 12:05 p. m. according to the stipulation of fact—plaintiff's customs broker appeared at the warehouse division of the Philadelphia customhouse and presented to a clerk there what are vaguely referred to as "the necessary papers and documents to effect the release and withdrawal of the said 49297 bags of sugar." The clerk (we are quoting from the stipulation of fact) "entered the withdrawal in the customs house ledger, initialed the original duty paid warehouse withdrawal for consumption," and returned the original and copies to plaintiff's broker, Mr. Frank M. Poole, Jr. Before anything further was done, a higher official, the deputy collector of the warehouse division, appeared on the scene and announced that "all withdrawals of sugar from the Republic of Cuba should be held up until he returned." He did return within a few minutes from the office of the assistant collector of customs, and informed his subordinate and also the customs broker for the plaintiff that a telegram had been received from the Bureau of Customs at Washington advising that sugar from Cuba entered or withdrawn for consumption after 11 p. m. September 11, 1939, would be subject to duty at the rates proclaimed by the President in T. D. 47040, May 12, 1934, rather than at the lower rates carried in the trade agreement with Cuba promulgated in T. D. 47232, August 25, 1934 (49 Stat. 3559). He also told plaintiff's broker that the entry would not be accepted unless it was accompanied with estimated duties at the rate of 1.5675 cents per pound, the rate provided in the Presidential proclamation, *supra*, on sugar of this polariscopic test, rather than at .9405 cent per pound, the rate carried in the Cuban Trade Agreement, *supra*, and the rate named by the importer in its withdrawal entry. The stipulation of fact further states:

Frank M. Poole, Jr. thereupon made no further efforts to effect the withdrawal for consumption of said sugar and left the Customs House.

The record shows that Mr. Poole did not come back, nor did he follow up in any way the incident described. Particularly, he made no tender of duty in any amount, neither that demanded by the collector nor that he had selected to pay. The contention of counsel for the plaintiff is that he did not have to make any tender because he knew the collector would have rejected it, citing cases which hold that a formal tender by one party is never required where the other party had indicated that if made it would not be accepted.

However, this argument is based, and could be based only on the theory that it is for the importer to select the rate of duty at which he chooses to enter his merchandise, and if he ascertains that the rate he selects is unacceptable to the collector he is relieved from making any tender. The mere statement of this argument is sufficient to show the

fallacy of it. The matter of proceedings on the entry of merchandise is provided for in section 505 of the Tariff Act of 1930, which reads in part as follows:

SEC. 505. PAYMENT OF DUTIES.

The consignee shall deposit with the collector, at the time of making entry, unless the merchandise is entered for warehouse or transportation, or under bond, the amount of duty estimated to be payable thereon. * * *.

This statute does not say by whom the estimate is to be made, nor do we know of any statute that does say so. But it would seem, *ex necessitate rei*, that it must be the collector, and we regard it as settled law now that the collector shall make the estimate. As long ago as 1894, the Supreme Court in the case of *Barney* v. *Rickard*, 157 U. S. 352 at 359 (39 L. ed. 730) said:

We assume that the procedure in estimating duties was for the collector, taking the invoice as true, to ascertain the amount which prima facie the importer should pay, and this he was compelled to pay in cash forthwith unless he entered the goods for warehousing.

This ruling has been accepted as being the law of the case; the latest decision we have found being *Central Commodities Corp.* v. *United States*, 6 Cust. Ct. 452, C. D. 514, where this court specifically held that the collector acted lawfully in refusing an entry because the duty as estimated by the entrant was not equal to the amount the collector held to be the lawful duty.

It would be profitless to extend this opinion further. There is absolutely nothing here to justify any claim or belief that the collector would have refused the withdrawal entry in question had it been accompanied by the amount of duty which the collector held was payable. It seems to the court that the incident at the customhouse was merely a conversation participated in by the plaintiff's broker, the deputy collector of the warehouse division, and a clerk in that division, which ended without any real effort being made to accomplish the withdrawal of the merchandise. There is really nothing in the incident to warrant judicial action. We note that the protest does not ask for any affirmative relief. We find that it states no cause of action, and should be dismissed.

As to the remaining protests, 46412–K and 47398–K, they are directed against the assessment of duty as made by the collector on the sugar covered by protest 46411–K and on the sugar brought in by a vessel named the *Darcoila*, warehouse entry 3705, September 19, 1939.

A rather detailed statement of the legislation, Presidential proclamations, and trade agreements relating to sugar and particularly to sugar from the Republic of Cuba is necessary to an understanding of the situation that eventuated in the litigation under consideration.

Paragraph 501 of the Tariff Act of 1930 assessed a duty of 1.7125

cents per pound on sugar when it tested by the polariscope between 50° and 75° sugar, with an additional duty of three hundred and seventy-five ten-thousandths of a cent per pound for each sugar degree in excess of 75°, with fractions of a degree in proportion. In respect to sugar from Cuba, these rates were subject to a preferential reduction of 20 per centum pursuant to the Cuban Reciprocity Treaty, effective December 27, 1903.

By Presidential proclamation, under authority of section 336 of the Tariff Act of 1930, the rates of duty on sugar as specified in said paragraph 501, *supra*, were reduced to 1.284375 cents per pound and the additional duty for degrees in excess of 75 was reduced to two hundred and eighty-one and one-fourth ten-thousandths of 1 cent, with fractions of a degree in proportion. This proclamation is set forth in T. D. 47040 of May 12, 1934. It made the rate on 99° sugar, such as that now before us, 1.5675 per pound.

Then came a trade agreement with Cuba (49 Stat. 3559) negotiated under authority of the Foreign Trade Agreements Act of June 12, 1934 (48 Stat. 943) whereby the rate on sugar of the character of that in suit, testing by the polariscope about 99°, was further reduced to .9405 cent per pound. That agreement is published as T. D. 47232, August 25, 1934, and it embodied a note expressly made, by article IV of the agreement, an integral part thereof. Said note reads as follows:

Note.—If and when the quota provisions of the Act "to include sugar beets and sugar cane as basic agricultural commodities under the Agricultural Adjustment Act, and for other purposes", approved May 9, 1934, become inoperative, and the Secretary of Agriculture gives public notice that no equivalent limitation on the importation of any article subject to that Act has been imposed, the duty on any such article imported into the United States of America from the Republic of Cuba shall be determined as though such article were not enumerated and described in this Schedule: provided, however, that such rate of duty shall not exceed that imposed on the day of the signature of this agreement.

Said agreement also contained the following in article XIII:

No administrative ruling by the United States of America or the Republic of Cuba effecting advances in duties or charges applicable under an established and uniform practice to imports from the territory of the other country shall be effective retroactively or with respect to articles either entered for or withdrawn for consumption prior to the expiration of thirty days after the date of publication of notice of such ruling in the usual official manner. The provisions of this article do not apply to administrative orders imposing antidumping duties, nor relating to sanitation or public safety, nor giving effect to judicial decisions.

Next in chronological order came the Sugar Act of 1937 (50 Stat. 903, U. S. C. 1940 ed., title 7, chap. 34). That act was an extensive revision and amplification of the sugar provisions of the Agricultural Adjustment Act cited in the note set forth above. It dealt in detail with domestic sugar production and established a sweeping control of

such production and of sugar imported from foreign countries and sugar brought to the continental United States from our island possessions and from the Philippines. It was quite specific in respect to sugar from Cuba. It authorized the establishment of quotas of sugar permitted to be marketed as well as of sugar permitted to be brought into continental United States from our island possessions and from the Philippines, or imported from foreign countries, including Cuba. It imposed excise taxes on manufactured sugar of domestic production and compensating taxes on imported manufactured sugar and articles in chief value thereof. It was, in short, a complete revision of the subject matter—sugar—and certainly superseded any provisions of an administrative nature found in prior statutes or trade agreements.

Section 509 of said sugar act provides in part as follows:

Sec. 509. Whenever the President finds and proclaims that a national economic or other emergency exists with respect to sugar or liquid sugar, he shall by proclamation suspend the operation of title II or III above, which he determines, on the basis of such findings, should be suspended, and, thereafter, the operation of any such title shall continue in suspense until the President finds and proclaims that the facts which occasioned such suspension no longer exist. * * *.

Pursuant to this authority the President on September 11, 1939, proclaimed the existence of a national economic emergency in respect to sugar and suspended the operation of title II of the sugar act (54 Stat. 2654) and the Secretary of Agriculture gave notice that there was no equivalent limitation on the importation of sugar for the period during which the quota provisions of the sugar act were suspended. This notice of the Secretary was published in T. D. 49962. Thereupon the Bureau of Customs of the Treasury Department notified collectors of customs that after 11 p. m. on September 11, 1939, the rates on imported sugar would revert to those named in T. D. 47040, *supra* (T. D. 49962). Later the date of effectiveness of the change in rates was corrected to 12:54 p. m. Eastern Standard Time, September 12, 1939 (T. D. 49977). This circumstance is of no importance in the case at bar for the first withdrawal after the change in duty was on September 26, 1939.

It is quite plain that the "Note" in the agreement with Cuba already quoted had the effect automatically of restoring the rates of duty that had been proclaimed in T. D. 47040, *supra*. The real issue between the parties here is when the change became effective, whether on September 12, 1939, or 30 days thereafter, namely, on October 12, 1939. Plaintiff points to article XIII of the trade agreement of August 24, 1934, between the United States and the Republic of Cuba, above set forth, claiming that under that provision no change in the duties on sugar could be made without giving 30 days' notice thereof. Defendant's rejoinder is in effect that the point urged by plaintiff is a political question not cognizable by this court.

We have given long and careful consideration to the various statutes and commercial agreements involved in this controversy, and to the arguments advanced by both sides, and we are constrained to say that said arguments have not been helpful in reaching a conclusion. The case must be decided on wholly different grounds from any that have been brought to the attention of the court. We shall endeavor to make such grounds clear.

The importations in question were made in 1939 and hence were governed by the terms of the Sugar Act of 1937, *supra*, insofar as they were applicable. Section 509 of that act set forth above is a clear and explicit direction to the President from Congress to suspend the quota provisions whenever he finds and proclaims the existence of a national economic emergency with respect to sugar. And the "Note" in the trade agreement with Cuba, *supra*, which was in effect at the time these importations were made, provides distinctly that in the event of such a happening the duty on sugar from Cuba should be that which would be imposed had sugar not been mentioned in the trade agreement.

However, the following events did happen: The President did find and proclaim a national economic emergency with respect to sugar; the Secretary of Agriculture did give public notice that no equivalent limitation on the importation of any article subject to the Sugar Act of 1937 has been imposed for the period of suspension of the quota provisions of that act; the President did suspend the quota provisions of that act, and therefore, automatically, the duties on sugar provided for in the trade agreement with Cuba of August 25, 1934, *supra*, ceased to be effective, and those imposed by the Presidential proclamation of May 12, 1934 (T. D. 47040), were restored. All this was done pursuant to a plan evolved by the lawmaking power and expressed in terms that are clear, explicit, and easily understood. There can be no doubt that this legislative mandate must prevail over any other provision, whether in a commercial agreement or elsewhere, with which it is in conflict. There are many reasons why this must be so. In the first place, article XIII of the trade agreement with Cuba, providing for a 30 days' notice before any administrative ruling affecting advances in duties or charges could become effective, is of no greater sanctity than the "Note" in the same agreement. The "Note" envisaged that very happening—a change in the duty in the event of the occurrence of an emergency. Then, too, the procedure to be followed upon the occurrence and proclamation of the emergency—the suspension of the quota provisions and the restoration of the old rate of duty—was not divisible. The suspension of the quota provisions could not be put into effect immediately and the change in duty be put off for 30 days. Finally, an action that is joined in by Congress, by the President, by the Secretary of Agriculture, and by the Secre-

tary of the Treasury (Bureau of Customs), is not correctly described by the term "administrative ruling." It far transcends in authority and prestige what is ordinarily designated as an administrative ruling. It does not come within the scope of the aforesaid article XIII at all. It follows from all this that the change of rate on sugar from Cuba was effective September 12, 1939 (T. D. 49977), and as the collector's action was in harmony with said Treasury instruction, it is hereby affirmed and protests 46412–K and 47398–K are overruled in all respects.

Judgment will be rendered accordingly.